Richard M. Garbarini (RG 5496)
GARBARINI FITZGERALD P.C.
250 Park Ave, 7th Floor
New York, New York 10177
Phone: (212) 300-5358
Fax: (888) 265-7054

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------- x

CHARMING BEATS LLC,                                    Case No.: 21-cv-8754

                              Plaintiff,              **ECF CASE**

              v.                                      **AMENDED COMPLAINT AND
                                                      JURY DEMANDFOR DAMAGES
                                                      FOR COPYRIGHT
YOUTUBE, LLC,                                         INFRINGEMENT**

                              Defendant.

------------------------------------------- x

Plaintiff CHARMING BEATS LLC, by and through the undersigned counsel, brings

this Amended Complaint against defendant YouTube, LLC, and allege, based on personal

knowledge as to acts and events taking place in their presence, on the investigation of counsel,

and on information and belief for all other allegations, as follows:

## SUBJECT MATTER JURISDICTION

This court has Subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question

jurisdiction) and 1338(a) (jurisdiction over copyright actions).

## SPECIFIC JURISDICTION

1.      Defendant maintains a headquarters in this Judicial District at Chelsea Market, 75 9th Ave, New York, NY 10011, and is properly subject to jurisdiction before this Court.

2.      Alternatively, defendant is headquartered at 901 Cherry Avenue San Bruno, CA 94066, and committed a tort without the State, knowing it would cause damage to plaintiff in New York.

3.      Defendant regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed orservices rendered, in the state.

4.      Defendant generates substantially all of its revenue from interstate and international commerce.

5.      Defendant directs its products to New York through its websites located at <www.youtube.com>.

6.      Jurisdiction is conferred over defendant pursuant to CPLR §§ 301, 302(3)(i) and (ii).

## VENUE

7.      A plaintiff may bring a case in: "(2) a judicial district in which a substantial partof the events or omissions giving rise to the claim occurred. . . ; or, (3) if there is no district in which an action may otherwise be brought . . . a judicial district in which any defendant is Infringing to the court's personal jurisdiction with respect to such action." 28 U.S.C. § 1391(b)(1)-(3).

8.      At bar, a substantial part of the events or omissions giving rise to the claim occurred in this Judicial District.

## DUE PROCESS

9.      There are no due process concerns in light of the fact that defendant maintains a headquarters in this Judicial District.  Defendant also committed an intentional tort that it knew had an effect in this Judicial District.

10.     Upon information and belief, defendant frequently contracts with companies in this Judicial District such that it reasonably knows it may be haled into this forum.

## PARTIES

11.     Plaintiff Charming Beats LLC is a limited liability company organized under the laws of New York with a headquarters located at 75-10 197th St, 2nd Floor, Flushing,NY 11366.

12.     Upon information and belief, defendant YouTube, LLC, is a Delaware limited liability company with its principal place of business at 901 Cherry Avenue, San Bruno, California 94066.  YouTube is a wholly owned and controlled subsidiary of Defendant Google.

## INTRODUCTION

13.     This case seeks to address the infringing conduct of defendant and the fact that defendant has created a two-system of enforcement and benefits on its video platform.  This two-tiered system of the "haves" and "have nots" has favored wide-scale copyright piracy only on the "have nots" to the benefit of no one but defendant,

14.     Defendant owns and operates the largest video-sharing website in the world. Defendant's video service is replete with videos infringing on the rights of plaintiff.  defendant has facilitated and induced wide-scale copyright infringement through its development and implementation of a copyright enforcement system that protects only the most powerful copyright owners such as major studios, media companies, and record labels and those users with a substantial number of subscribers.

15.     Defendant has no meaningful copyright enforcement policy, which has forced plaintiff to file daily Digital Millennium Copyright Act ("DMCA") Take-Down Notices directed to the infringing content uploaded to defendant's video platform.

16.     Defendant has ignored plaintiff's DMCA Take-Notices, and engaged in a pattern of practice of destroying evidence regarding plaintiff's notices in an attempt to conceal its infringing conduct and failure to comply with the requirements specified in the safe-harbor provisions of the DMCA.

17.     Plaintiff is an ordinary copyright owner and content creator and has been denied any meaningful opportunity to prevent defendant's public display of works that infringe its copyrights—no matter how many times its works have previously been pirated on the platform.

18.     These limitations are deliberate and designed to maximize defendant's (and its parents Google's) focused but reckless drive for user volume and advertising revenue.

19.     Defendant lost its right to invoke the safe-harbor protections of the DMCA because it has: (i) refused to honor DMCA Take-Down Notices, (ii) refused to give strikes to related to the removal of 98% of the infringing content on its video platform, (iii) refused to give strikes to Content ID partners and accounts with a large number of subscribers, (iv) hidden the identity of infringers, (v) allowed the wide-scale piracy on its site to continue unabated, and (vi) allowed accounts with 4-5 strikes in a eight-day period to remain active in direct contravention to its stated repeat-infringer policy.

20.     Defendant also created infringing music only videos on its own, without a third-party upload.

## FACTS

21.     Plaintiff is the sole beneficial owner by assignment of an original copyrighted musical composition and recording titled *"Anything You Synthesize"* – U.S. Copyright Registration No. SR 713-287. See **Exhibit 1.**

22.     Defendant owns and operates the largest video-sharing website in the world located at <www.youtube.com>.

## THE SUBJECT INFRINGING DERIVATIVES

23.     Plaintiff has spent the last four years filing hundreds of DMCA Take-Down Notices on defendant to remove the same infringing content.

24.     The infringing content at issue here are videos that synchronize two infringing musical tracks.  The main infringing derivative is titled "Caramelo".  The infringing derivative "Caramelo" is an infringing derivative distributed by Warner Music Group that consists of a musical component--which is an unlicensed reproduction of the Copyrighted Track, and lyrics performed over the Copyrighted Track by the French "rapper" Ninho (the "First Infringing Derivative").

25.     An unlicensed reproduction of the Copyrighted Track runs from the beginning to the end of the First Infringing Derivative.

26.     Over 38% of the First Infringing Derivative is just the Copyrighted Track with no lyrics.

27.     The First Infringing Derivative is an infringement of plaintiff's rights as set forth in 17 U.S.C. § 106.

28.     In 2017, after a very public lawsuit filed by plaintiff's predecessor in interest against Warner Music Group titled *Yesh Music, LLC v. Warner Music Group Corp*., 2019-cv-7832 (E.D.N.Y.) (the "Warner Action"), all uploads of the First Infringing Derivative were

removed from every digital service provider (except defendant's and Facebook).

29.     The second infringing derivative at issue here is a track tiled "Половина моя" which is an infringing musical derivative that consists of the Copyrighted Track with the Russian rapper Miyagi rapping over the Copyrighted Track (the "Second Infringing Derivative").

30.     An unlicensed reproduction of the Copyrighted Track runs from the beginning to the end of the Second Infringing Derivative.

31.     The Second Infringing Derivative is an infringement of plaintiff's rights set forth in 17 U.S.C. § 106.

## DEFENDANT'S DIRECT INFRINGEMENT

32.     Defendant uploads, on its own initiative, infringing reproductions of the First Infringing Derivative.

33.     The is a screen-shot is an "auto-generated" upload dated November 27, 2021 of the First Infringing Derivative that falsely purports to originate from Rec 118/Mal Lune Music.



34.     Auto-generated, of course, means the music-only video was generated by defendant directly.

35.     Both Rec 118 and Mal Lune Music have denied defendant's claim that they provided the First Amended Derivative to defendant for upload.

36.     This is not the first-time defendant, on its own initiative, directly distributed and publicly displayed the First Infringing Derivative.

37.     Defendant also shielded its own infringing upload from its key-word search tool. Instead, defendant's infringing upload can only be accessed by playing defendant's playlists.

38.     This is a direct infringement of plaintiff's exclusive rights by YouTube as set forth in Sections 101 and 106 of the Act.

39.     Defendant also creates auto-generated playlists.  One auto-generated playlist is titled "Song Radio".  The Song Radio playlist frequently includes reproductions of the First Infringing Derivative shortly after the infringing content is uploaded.

40.     Defendant uploads directly, or searches for and finds, videos synchronizing the First Infringing Derivative and places them in a playlist referred to as Song Radio knowing the content is infringing.

41.     Defendant also teams with its parent company Google to ensure increased distribution and public display of known infringing content.

42.     The first entry on any Google search for the two Infringing Derivatives is a copy of the known infringing content on defendant's video platform.

43.     For example, after defendant refused to disable the video synchronizing the First Infringing Derivative that were provided by Content ID partner Distrokid, the very same unlicensed and infringing videos appeared as the first entry in a Google search for "Ninho

Caramelo".

44.     Defendant takes the affirmative act of promoting the videos synchronizing the First Infringing Derivative knowing that the First Infringing Derivative infringes the exclusive rights of plaintiff.

45.     This makes defendant an active participant in the infringement and is a direct infringement of plaintiff's exclusive rights by YouTube as set forth in Sections 101 and 106 of the Act.

## THE FLAWED DMCA TAKE-DOWN SYSTEM

46.     Plaintiff has been forced to hire counsel to file daily DMCA Take-Down Notices on defendant for videos synchronizing the First and Second Infringing Derivatives.

47.     Plaintiff's counsel is forced to conduct daily key work searches in an attempt to identify the daily upload of videos synchronizing the First and Second Infringing Derivatives.

48.     The key word searches do not identify all of the infringing uploads of the First and Second Derivatives.

49.     In fact, infringing uploads are sometimes "blacked out" from the key word search process.  As discussed below, a recent upload directly by defendant was discovered by pure chance.

50.     The process is complicated by a group of individuals who have overtly stated on YouTube that they will continue to create accounts for the sole purpose of uploading copies of videos synchronizing the First Infringing Derivative, despite the vigilance of the DMCA Take-Down Notices.

51.     These individuals simply create new accounts, and upload the same infringing content.

52.     It is nearly impossible to locate all of the uploads of videos synchronizing the First and Second Infringing Derivative.

53.     For example, some uploaders use the name "Nhino Caramelo" instead of "Ninho Caramelo" for the First Infringing Derivative.  This small change eliminates the infringing content from keywork searches for "Ninho Caramelo".

54.     Other uploaders have used the first line of the First Infringing Derivative as the tittle—Le compte morale a zero.  Again, this makes a keyword search for the infringing upload impossible.

55.     Plaintiff, through counsel, must run a half dozen different keyword searches each day with the hope of locating all of the uploads of videos synchronizing the First Infringing Derivative.

56.     Illegal uploads to defendant's video platform of videos synchronizing the Second Infringing Derivative are impossible to locate.

57.     The Second Infringing Derivative is in Russian, and variances of the track name are not in the Latin alphabet.  This makes keyword searches irrelevant for all but a small group of infringing videos that are uploaded with the exact name.

58.     Defendant's on-line system purportedly keeps an on-line Removal Request Report of all DMCA Take-Down Notices filed since the system's implementation.

59.     Defendant, however, manipulates the Removal Request Report, removing requests for the removal of content uploaded by defendant's Content ID partners.  Defendant also removes the identity of users with a large number of subscribers in order to protect these users and allow their continued infringement.

60.     A copy of the current first three pages of the Removal Request Report is attached at **Exhibit 2**.

61.     Plaintiff, however, preserved the original version of the Removal Request Report prior to defendant's unilateral elimination of the identifying content. See **Exhibit 3**.

62.     Below is an example identical pages, one from the original Removal Request Report, the second from the modified Removal Request Report.

| Original Report | | | Report Modified by Defendant | | |
|---|---|---|---|---|---|
| MiyaGi & Эндшпиль - Половина моя (Lyrics)<br>Contains: Anything You Synthesize | GOLDEN YEREVAN<br>388.0K subscribers | Oct 21, 2021 | Video removed<br>Contains: Anything You Synthesize | - | Oct 19, 2021 |
| MiyaGi & Эндшпиль - Половина моя<br>Contains: Anything You Synthesize | MazaRulit<br>11.6K subscribers | Oct 21, 2021 | Video removed<br>Contains: Anything You Synthesize | - | Oct 19, 2021 |
| Мияги & Эндшпиль - Половина Моя (slowed ...<br>Contains: Anything You Synthesize | reflexer music<br>520 subscribers | Oct 21, 2021 | Video removed<br>Contains: Anything You Synthesize | - | Oct 19, 2021 |
| Miyagi & Эндшпиль - Половина моя (Lyric vi...<br>Contains: Anything You Synthesize | HAJIMAN<br>414.0K subscribers | Oct 21, 2021 | Video removed<br>Contains: Anything You Synthesize | - | Oct 18, 2021 |
| Ninho - caramelo<br>Contains: Anything You Synthesize | Farrasito57<br>6 subscribers | Oct 21, 2021 | Video removed<br>Contains: Anything You Synthesize | - | Oct 18, 2021 |
| Ninho - Caramelo (Repost)<br>Contains: Anything You Synthesize | Jibril /<br>47 subscribers | Oct 21, 2021 | Video removed<br>Contains: Anything You Synthesize | - | Oct 18, 2021 |
| Ninho - Caramelo (Repost)<br>Contains: Anything You Synthesize | Jibril /<br>47 subscribers | Oct 21, 2021 | Video removed<br>Contains: Anything You Synthesize | - | Oct 18, 2021 |
| ninho, caramelo<br>Contains: Anything You Synthesize | mydraxx 99<br>9 subscribers | Oct 20, 2021 | Video removed<br>Contains: Anything You Synthesize | - | Oct 16, 2021 |
| Ninho - Caramelo (exclu)<br>Contains: Anything You Synthesize | Rap-Exclu<br>332 subscribers | Oct 19, 2021 | Video removed<br>Contains: Anything You Synthesize | - | Oct 16, 2021 |
| Ninho CARAMELO<br>Contains: Anything You Synthesize | Jsp<br>12 subscribers | Oct 19, 2021 | Video removed<br>Contains: Anything You Synthesize | - | Oct 16, 2021 |

63.     As the prior chart demonstrates, all of the DMCA Take-Down Notices from October 20-21, 2021 were surreptitiously removed completely by defendant from the Removal Request Report in a blatant attempt by defendant to conceal its non-compliance with the DMCA.

64.     The infringing content, however, is still active on defendant's video platform.

65.     Defendant has also wiped all the evidence demonstrating that users have received five strikes without any action taken by defendant.

66.     The above chart also demonstrates how all of the user names and video information have been wiped in an attempt by defendant to conceal the fact that it has not

removed the infringing content, nor has it assessed a penalty on repeat infringers.

67.     Defendant was served with notice that plaintiff intended to file the within suit on three separate occasions.  Despite its duty to preserve documents, defendant materially altered the electronic documents to conceal its infringing conduct and outright refusal to comply with the DMCA.

68.     Defendant lost its right to invoke the safe-harbor provisions of the DMCA.

### DMCA TAKE-DOWN NOTICES TO DEFENDANT

69.     Prior to defendant's implementation of its current on-line DMCA Take-Down form, plaintiff served twenty-seven paper DMCA Take-Down Notices, each containing up to twelve videos synchronizing the First Infringing Derivative. See, e.g., **Exhibit 4**.

70.     After the implementation of defendant's on-line DMCA Take-Down form, plaintiff has been forced to serve over DMCA Take-Down Notices for 224, to date, illegal uploads of videos synchronizing the First Infringing Derivative.

71.     Plaintiff has served approximately ten DMCA Take-Down Notice's on videos synchronizing the Second Infringing Derivative.   Nearly all of the infringing content related to this group of DMCA Take-Notices is still active on defendant's video platform.

72.     Plaintiff has been forced to serve daily DMCA Take-Down Notices to remove infringing videos the synchronize the First and Second Infringing Derivatives.

73.     As of the date of this Amended Complaint there are dozens of infringing videos on defendant's video platform that synchronize both the First and Second Infringing Derivatives which plaintiff will be forced to extend the time locating and serving notices of removal.

74.     The infringing videos sought to be removed are "music-only videos".  A Music-only video is a static image, generally the cover-art for the infringing derivative, and a

synchronized copy of the infringing track that plays from the beginning to the end of the video.

## DEFENDANT HAS REFUSED TO ALLOW PLAINTIFF
## TO ACCESS TO ITS CONTENT ID SYSTEM

75.     The copyright management tool that YouTube provides to the major labels in the music industry is called the Content ID—a digital fingerprint tool that compares videos being uploaded on YouTube to a catalogue of copyrighted material submitted by those entities permitted to utilize Content ID.

76.     Content ID allows the major labels to remove infringing content through defendant's automated system, and frees the major labels from the pain staking, and time consuming, task of searching for infringing content, and then serving DMCA Take-Down Notices for that infringing content.

77.     Plaintiff has been denied access to Content ID on two occasions.

## DEFENDANT PERMITS PIRACY AS PART OF ITS BUSINESS MODEL

78.     Defendant permits and facilitates this infringement because it furthers its growth and revenue strategy and because it has determined that plaintiff—unlike YouTube's preferred Content ID partners—lacks the resources and leverage necessary to combat copyright infringement on the scale at which it is perpetuated on YouTube.

79.     YouTube has more than 2 billion users worldwide every month, which according to defendant is "almost one-third of the internet."   Users watch more than one billion hours of videos every single day, equating to approximately 5 billion videos viewed each day.  YouTube estimates that more than 720,000 hours of videos—more than 82 years' worth—are uploaded every day, equating to more than 500 hours of content uploaded every minute.

80.     To become the preferred platform for both uploaders and viewers, however, defendant knowingly permitted its video platform to become a hotbed for piracy.

81.     From its start, YouTube recognized that its success was highly dependent on the rapid growth in online postings (or "uploads") of "user-generated content," to be uploaded quickly and with no prepublication diligence, making the unauthorized upload of copyrighted material unavoidable.

82.     Given the two-sided market YouTube functions in—where it wants to drive both viewers and content providers--defendant's motives are obvious.  The ready availability of pirated content is the source of "network effects."   A vast library of pirated content draws users to the site, and the growth in users incentivizes the posting of more content on YouTube, which in turn enables defendant to reap more advertising revenue.  Building extensively on the backs of copyright holders like plaintiff who never gave authorization for their works to be displayed on YouTube.

83.     Defendant reports that it now derives $15 billion in revenue from advertising on YouTube, as well as unspecified billions from subscriptions, other YouTube services, and the exploitation and monetization of personal data harvested from all of its users.

84.     In addition to the billions of dollars of direct advertising revenue, the Google search and advertising platform independently gains massive value capitalizing on the rapid upload of materials, much of which infringes on plaintiff's copyrights.  Every time a viewer engages with the YouTube platform, Google harvests valuable information on individual user preferences and aggregate user demographics.  This data is used to develop targeted advertising for YouTube, for Google, and further across the internet via Google's AdSense, AdX, and AdManager products and services, each of which generate additional billions of dollars for defendant.  Google is estimated to control 40% of the online advertising market, with much of it built on data it gathers from YouTube viewers drawn to the website by infringing material.

85.     Faced with litigation by major music studios and other significant rights holders, defendant has crafted distinct and disparate systems of copyright "enforcement" on their platform.  For those entities with vast stores of copyright material and thus the leverage to require defendant to appease its copyright management concerns, defendant created its Content ID product, which allows qualifying copyright owners automatically to identify and manage their content on YouTube.  Videos uploaded to YouTube are scanned against a database of files that have been submitted to defendant by those qualifying copyright owners.  Such owners get to decide what happens when content in a video on YouTube matches a work they own; the available options are (on a country-specific basis) to block the whole infringing video from being viewed, monetize the infringing video by running ads against it (in some cases sharing revenue with the uploader), or track the infringing video's viewership statistics.

86.     Smaller rights holders, like plaintiff, are denied access to Content ID and thus are relegated to vastly inferior and time-consuming manual means of trying to police and manage their copyrights such as scanning the entirety of YouTube's postings, searching for keywords, titles, and other potential identifiers.  Plaintiff must file individual takedown notices with defendant via a web-form, email, or postal mail for each video its searches identify.  Defendant has, in effect, created a two-tiered system whereby the rights of large creators with the resources to take defendant to court on their own are protected, while smaller and independent creators like plaintiff are deliberately left out in the cold.

87.     Defendant also creates playlists of music.  Defendant consistently includes the infringing content in one of the playlists.

**DEFENDANT'S CONTENT ID SYSTEM ENCOURAGES REPEAT INFRINGERS**

88.     Content ID is not only unavailable to plaintiff, but it actually insulates the vast majority of known and repeated copyright infringers from YouTube's repeat infringer policy, thereby encouraging its users' continuing upload of infringing content.

89.     Defendant has completely divorced their Content ID product from their legally mandated repeat-infringer policy.  The DMCA provides a safe harbor against copyright infringement claims for entities such as YouTube so long as they formulate and reasonably enforce a policy of terminating repeat copyright infringers from their platform. YouTube purports to take advantage of this safe harbor by having a policy that assesses a "copyright strike" against the uploader when an ordinary rights holder files a takedown notice and terminating uploaders when they accrue three active copyright strikes within 90-days.

90.     When infringing content is uploaded and subsequently identified and removed by Content ID, no copyright strike is issued.

91.     While defendant states that Content ID eligibility is based on a variety of criteria, only five percent or less of all people who apply for Content ID are approved.  Plaintiff has applied twice and been rejected each time.

92.     Defendant's own Help page expressly states, "Content ID claims don't result in a strike."

93.     Defendant is liable for the copyright piracy on their platform because its current approach to copyright infringement, including the operation of Content ID, fails to satisfy the requirements mandated in order to be protected under the DMCA safe harbor provisions.

94.    The overall effect of defendant's inducement of copyright infringement, manipulation of search, willful blindness, data harvesting, and selective enforcement of copyright screening tools is to depress the value of creators' work and destroy the free marketplace for those works, where willing buyers and willing sellers can transact business. Instead, defendant has created an alternative and unlawful marketplace, where the advertising revenue and valuable data it derives from publishing those works—free of charge to the consumer—bears no rational relationship to the creator's real cost of producing those works; this significantly injures the creators, but enormously benefits defendant.

<strong>ADDITIONAL SUPPORT DEMONSTRATING<br>DEFENDANT LOST ITS SAFE-HARBOR PROTECTION</strong>

95.    The DMCA's "safe harbor" regime offers immunity to claims of copyright infringement if (among other requirements) online service providers promptly remove or block access to infringing materials after copyright holders give appropriate notice.

96.    Theoretically, any user that receives three copyright "strikes" in 90 days will have their account terminated.

97.    Defendant's repeat infringer policy is a farce.  Defendant has failed to assess penalties, including copyright strikes and termination of repeat infringers.  Instead, defendant encourages and incentivizes users to continue posting infringing content.

98.    Defendant has constructive (if not actual) knowledge of the infringements is an independent basis to deny access to the DMCA safe harbors.

99.    Defendant has created a two-tiered hierarchy, whereby one group is subject to enforcement of defendant's repeat infringer policy, and the other group is immune to defendant's repeat infringer policy.

100.    The top tier which consists of major labels, large media companies, and

subscribers with a significant number of subscribers.  These Content ID partners and users with significant subscribers, are exempt from the copyright strike system.  The top tier can upload infringing content with impunity and without the fear of any retribution.

101.    The second tier consists of the average user who faces the termination of their account if they receive three copyright "strikes" in a 90-day period.

**No Strikes Associated with Content ID Removal**

102.    Defendant ignores the vast majority of piracy on its site.  It does not issue strikes to removals that come through Content ID.  Defendant has admitted that 98% of all removals come through Content Id.

103.    This renders the enforcement of defendant's repeat infringer policy meaningless.

104.    Defendant doesn't want to remove the tens of thousands of users each month that receive strikes through Content ID.  Defendant, instead, encourages more uploads to its system, regardless of whether that content infringes on the rights of copyright holders.

105.    In defendant's two-tiered system, major labels and rights holders (representing over 80% of the music content on YouTube) can automatically remove infringing content.

106.    This puts the burden on non-Content ID parties, like plaintiff, who must serve a prolific number of daily DMCA Take-Down Notices to stay on top of the infringing content being uploaded.  Defendant's take-down system is flawed because content creators can never keep up with the number of infringing videos uploaded each day.

107.    This Amended Complaint involves a single Copyrighted Track owned by plaintiff because it is impossible for plaintiff to police the other 144 copyrighted tracks in its catalogue. There are thousands of infringing videos that contain unlicensed synchronized copies of plaintiff's other tracks, but the burden of policing them is impossible.

108.    Plaintiff has served DMCA Take-Down Notices for over 400 uploads of the same First Infringing Derivative.

109.    Plaintiff is forced to serve daily DMCA Take-Down Notices covering just the Copyrighted Track.

110.    The daily burden to remove infringing videos synchronizing the First Infringing Derivative alone forces plaintiff to ignore the thousands of unlicensed uploads of its other copyrighted tracks.

111.    The fact that defendant does not issue strikes from 98% of the videos removed due to copyright infringement, has allowed a free-market for piracy, where only the top-tier labels can adequately protect themselves through automatic removals.

112.    This allows prolific repeat infringers to continue their infringing conduct on YouTube rather than face the possibility of having their page deleted due to strikes.

**DEFENDANT DOESN'T ISSUE STRIKES TO TOP-TIER USERS**

113.    When a top-tier user—major labels, media companies, and users with a substantial number of subscribers—uploads infringing content, it is immune from defendant's repeat infringer policy.  In fact, most often the infringing content uploaded by this group is not removed after a DMCA Take-Down Notice is filed.

114.    On at least five occasions, infringing videos synchronizing the First and Second Derivative has been uploaded by a Content ID partner.

115.    When DMCA Take-Down Notices are filed for the infringing content uploaded by Content ID partners, defendant either outright refuses to remove the content, or, after numerous requests are made for the same infringing content, defendant will contact the Content ID partner and allow the partner to voluntarily remove the infringing content.

116.     No strike is ever issued against a "trusted" Content ID partner, no matter how many times the partner uploads the same infringing content.

**CONTENT ID PARTNER DISTROKID WAS ALLOWED TO UPLOAD THE FIRST INFRINGING DERIVATIVE FOUR TIMES WITHOUT A STRIKE**

117.     The group of prolific infringers that upload the First Infringing Derivative on a daily basis discovered a way to avoid plaintiff's near daily filing of DMCA Take-Down Notices.

118.     The infringers submitted the First Infringing Derivative to Content ID partner DistroKid for upload to YouTube.

119.     Each time the First Infringing Derivative was uploaded by Content ID partner DistroKid, it became exempt from the YouTube copyright enforcement policy and practice. Not only was the First Infringing Derivative not subject to removal due to a DMCA Take-Down Notice, no strike was ever be given to DistroKid due to the upload of the infringing content.

**First Upload by DistroKid**

120.     On May 1, 2019, a DMCA Take-Down Notice was served to remove a video synchronizing the First Infringing Derivative. The subject infringing content, however, was submitted to YouTube by its Content ID partner DistroKid.



121.     YouTube refused to remove the infringing content on the ground it was generated from content provided to it by a "trusted" Content ID partner.

122.     Plaintiff's counsel was forced to prepare a Notice of Litigation, and inform defendant that if it did not remove the infringing content, a complaint for copyright infringement would be filed. At the doorstep of litigation defendant finally informed Content ID partner

DistroKid, and the infringing content was removed.

123.    No strike was ever issued.

**Second Upload by DistroKid**

124.    On August 16, 2021, a DMCA Take-Down Notice was served seeking the

removal of a video synchronizing the First Infringing Derivative.



125.    On August 18, 2021, defendant denied the DMCA Take-Down Notice on the

ground the video synchronizing the First Infringing Derivative was generated from content

furnished to defendant by Content ID partner DistroKid, LLC.

126.    Defendant responded as follows:

> The following URLs were provided to us under license by a YouTube
> partner for use by YouTube as an Art Track:
>
> http://www.youtube.com/watch?v=HaWeTiJUvi4
>
> You can find the licensor's name in the video description, where it says,
> "Provided to YouTube by [licensor name]". Even if the licensor's name is
> unfamiliar to you, they may be a distributor or other authorized company
> who works with your label. When the licensor provided us with the
> content, they asserted their right to distribute it on YouTube. For this
> reason, we will not be able to comply with your removal request. You
> may wish to pursue the matter with the licensor or reach out to your label
> about whether they work with the licensor on your behalf.
>
> If you still believe that you have the exclusive rights to the content and
> that it should not be on YouTube, please let us know on this thread and
> explain the outcome of the conversation you've had with your label. At
> that point, we'll re-evaluate your request.

See **Exhibit 5**.

127.    After several more demands were made by plaintiff, through counsel, defendant

continued its refusal to remove the infringing content.

128.    Plaintiff, through counsel, finally served a cease-and-desist directly on Content

ID partner DistroKid.

129.    Content ID partner DistroKid eventually directed defendant to remove the

infringing content.  No strike was ever issued.

**Third Upload by DistroKid**

130.    On September 12, 2021, plaintiff, through counsel, once again served a DMCA

Take-Down Notice for a video synchronizing the First Infringing Derivative.



131.    Defendant responded, as it did before, that it could not remove the infringing

content because it was uploaded by a trusted partner.

> The following URLs were provided to us under license by a YouTube
> partner for use by YouTube as an Art Track:
>
> http://www.youtube.com/watch?v=7nWXkeaEA5M
>
> You can find the licensor's name in the video description, where it says,
> "Provided to YouTube by [licensor name]". Even if the licensor's name is
> unfamiliar to you, they may be a distributor or other authorized company
> who works with your label. When the licensor provided us with the
> content, they asserted their right to distribute it on YouTube. For this
> reason, we will not be able to comply with your removal request. You
> may wish to pursue the matter with the licensor or reach out to your label
> about whether they work with the licensor on your behalf. If you still
> believe that you have the exclusive rights to the content and that it should
> not be on YouTube, please let us know on this thread and explain the
> outcome of the conversation you've had with your label. At that point,
> we'll re-evaluate your request.

132.    Once again, the request was denied, and a back forth email campaign began of the

removal of the video synchronizing the First Infringing Derivative.

133.    Defendant did not remove the First Infringing Derivative.  Instead, plaintiff

served another cease-and-desist on DistroKid, and the third-party DistroKid eventually removed

the video synchronizing the First Infringing Derivative.

**Fourth Upload by Distro-Kid**

134.    On October 8, 2021, Content ID partner DistroKid once again uploaded a video

synchronizing the First Infringing Derivative.

135.    On October 10, 2021, a DMCA Take-Down Notice was served for the infringing

content.



136.    Plaintiff's DMCA Take-Down Notice was once again denied by defendant.

137.    Despite plaintiff's repeated demands, defendant refused to remove the infringing

content.

138.    On or about October 16, 2021, plaintiff served a cease-and-desist on DistroKid

the infringing content.

139.    Defendant's Content ID partner DistroKid finally removed the infringing content.

140.    No copyright strike was ever issued.

141.    Defendant has refused to assess any penalty against its Content ID partner

DistroKid, despite its repeated upload of the same infringing content.

**Defendant Refused to Remove Second Infringing Derivative**

142.    On October 21, 2021, nine DMCA Take-Down Notices were served for the

Videos synchronizing the Second Infringing Derivative.

143.    Defendant removed one of the infringing videos, but refused to remove the other

eight infringing videos.

144.     For example, the DMCA Take-Down Notice as reported on defendant's Removal

Request Report is shown below



145.     The above video synchronizing the Second Infringing Derivative, however, was

uploaded by defendant's Content ID partner NDA Sound.

146.     On October 22, 2021, defendant denied the DMCA Take-Notice Notice stating:



147.     Counsel for plaintiff responded as follows:

> The infringer is not a licensee, licensor, or distributor authorized to exploit
> my client's copyrighted recording Anything You Synthesize, U. S.
> Copyright registration No. SR 713-287.  The unlicensed synchronized
> copyrighted track of my client is synchronized from the beginning to the
> end of the subject video.
>
> This infringes my client's rights pursuant to 17 USC 106, and if YouTube,
> Inc. doesn't want to be named as a defendant, remove the video
> expeditiously.  I brought a lawsuit against Facebook last week, Charming
> Beats v. Facebook, Inc., 21-cv-8609 (EDNY).  YouTube is now on notice
> that it is liable for a direct infringement, and will lose its right to invoke
> the safe-harbor provisions of the DMCA if this video is not removed.



148.    Defendant responded on October 24, 2021 as follows:

> We've received your complaint and determined it requires further examination.
> We'll get back to you once we've completed our review.



149.    Despite two more demands from plaintiff's counsel, defendant has, of the date of this Amended Complaint, refused to remove the infringing content.

150.    Defendant not only refused to remove the content, but, as stated previously, it serreptitiously removed this, and the other eight, May 21, 2021 DMCA Take-Down Requests from the Removal Request Report.

151.    Defendant did this in a transparent attempt to conceal its infringing conduct, and failure to comply with the requirements to invoke the safe-harbor provisions of the DMCA.

### DEFENDANT EXEMPTED USERS WITH A LARGE NUMBER OF SUBSCRIBERS FROM THE REPEAT INFRINGER POLICY

152.    Defendant actually informs Content ID partners and infringers that have a significant number of subscribers that a DMCA Take-Down Notice was filed, rather than remove the content and issue a strike.

153.    This affords this group of users the opportunity to remove the infringing content without receiving a strike.

154.     As the below demonstrates, a major channel with significant subscribers was afforded the opportunity to voluntarily remove the infringing content rather than receive a strike.



155.     The above user "Golden Yerevan" is a movie production company with 389,000 subscribers.  Rather than issue a strike to Golden Yerevan, it was allowed to remove the infringing content voluntarily.

156.     As per defendant's policy, for normal content providers, no notice is given prior to the removal of infringing content, and a strike is assessed.

157.     The infringing content posted by Golden Yerevan, however, was somehow "already removed" less than 24 hours after the DMCA Take-Down Notice was filed.

158.     After the initial voluntary removal by Golden Yerevan, the user reuploaded the same infringing conduct and defendant surreptitiously removed any evidence of the DMCA Take-Down Notice from the Copyright Removal report.

159.     Any other average user would have received a strike, but defendant has a different set of rules for Content ID members and accounts with significant number of subscribers.

160.    Equal enforcement of the strike policy is non-existent on defendant's website. Instead, a two-tiered system has been created whereby one group is immune from the strike policy.

161.    Defendant has extended the immunity from the strike system to users that have hundreds of subscribers.

162.    On November 4, 2017, defendant served DMCA Take-Down Notices on users with only 214-570 subscribers.  The YouTube users were allowed the opportunity of removing the infringing content, rather than receive a strike.

| | | | |
|---|---|---|---|
| NINHO - CARAMELO (LISEZ LA DESCRIPTION ...<br>Contains: Anything You Sythesize | Daarwa 57<br>437 subscribers | Nov 4, 2017 | ● Inactive<br>Video already removed |
| Ninho- Caramelo (télécharger vite)<br>Contains: Anything You Synthesize | ShaYZou Gaming<br>214 subscribers | Nov 4, 2017 | ● Inactive<br>Video already removed |
| Ninho-"Caramelo"(A télécharger vite)<br>Contains: Anything You Synthesize | HadesYz & Imlégit<br>570 subscribers | Nov 4, 2017 | ● Inactive<br>Video already removed |
| Ninho-"Caramelo"(A télécharger vite)<br>Contains: Anything You Synthesize | HadesYz & Imlégit<br>570 subscribers | Nov 4, 2017 | ● Inactive<br>Video already removed |

163.    As the above shows, YouTube user "HadesYz & Imlégit" was allowed to avoid two strikes by voluntarily removing the infringing content.

164.    One of the infringers "Daawra 57" re-uploaded the infringing content the day after the user was afforded the opportunity to take to down.  When a DMCA Take-Down Notice was served for the new upload by "Daarwa 57", defendant removed the content, but did not issue a strike.

165.    Defendant has willingly allowed these repeat infringers to continue the upload of the same infringing content without penalty.

| | | | |
|---|---|---|---|
| NINHO - CARAMELO (LISEZ LA DESCRIPTION ...<br>Contains: Anything You Synthesize | Daarwa 57<br>437 subscribers | Nov 6, 2017 | ● Resolved<br>Video removed |

166.     Defendant's repeat offender policy is selectively enforced, and defendant is complicit in the infringing conduct of these users.

### DEFENDANT HIDES THE IDENTITY OF CERTAIN INFRINGERS

167.     Defendant not only allows Content ID partners and users with significant number of subscribers to avoid the copyright strike system, defendant also hides the name of these users on the copyright removal chart.



168.     Defendant even allowed one infringer to make the infringing content private. Again, the identity of the infringer has been removed from the chart, but the video is still active as of the date of this Amended Complaint.



169.     While the above left indicates the video has been removed, the above right shows the video is still active but has been designated private.

27

**DEFENDANT HAS ALLOWED USERS 4 OR 5 STRIKES WITHOUT PENALTY**

170.   On at least two occasions, defendant has failed to stop repeat infringers despite

the fact that the infringers received four or five strikes in a ten-day period.

171.   For example, JSP on the chart below was up to five strikes.

172.   As the above demonstrates, user "Jsp" was allowed five strikes in a six day period

without penalty

173.   There was at least one additional infringer with four strikes, but the defendant

removed that infringer from the Removal Request Report.

174.    Defendant has: (i) refused to honor DMCA Take-Down Notices, (ii) refused to give strikes as per defendant's repeat infringer policy to 98% of defendant's infringing users, (iii) refused to give strikes to Content ID partners and users with a large number of subscribers, (iv) hidden the identity of infringers, (v) surreptitiously removed DMCA Take-Down Notices from the Removal Request Report to hide its infringing conduct; (vi) allowed the piracy on its site to continue unabated, and (vii) allowed users 4-5 strikes in a one-two week period without penalty.

175.    Defendant: (i) had actual or constructive knowledge of the infringing conduct on its service, and taken no action; (ii) woefully failed to adopt and implement a policy of terminating the accounts or subscriptions of repeat infringers; (iii) failed to inform account holders of the repeat infringer policy; and (iv) directly interfered with the recording and documentation of DMCA Take-Down Notices.

176.    Defendant has lost its right to invoke the safe-harbor protections of the DMCA.

### DEFENDANT'S FARCICAL COPY REMOVAL BUTTON

177.    On or about October 20, 2021, defendant claimed to have implemented an option for copyright holders to remove copies of infringing content from being re-uploaded to defendant's video platform.

178.    At no time, however, has the exact same infringing content been prevented from upload, or deleted after upload, despite the representation made with the nonsense copy removal option.

179.    Plaintiff has been forced to continue to serve daily DMCA Take-Down Notices for the exact same infringing content previously removed.

180.    Defendant's "prevent copies" option is a farce, with no real functionality.

## DEFENDANT'S FURTHER DIRECT INFRINGEMENT

181.    Defendant has allowed infringing content to remain active on its system despite the service of a DMCA Take-Down Notices.

182.    On the date of the Amended Complaint in this matter was filed, the Second Infringing Derivative "Половина моя" at the URL <https://www.youtube.com/watch?v=yHjmbJV-ydw> was still active.  In fact, seven of the nine infringing videos that synchronize the Second Infringing Derivative, which were subject to multiple prior DMCA Take-Down requests, were still active on defendant's video platform.

183.    Defendant actually removed the DMCA Take-Down Notices from the Copyright Request Report in a blatant attempt to evade its obligations under the DMCA and allow the infringing content to remain on its website.

184.    Defendant has, or had, actual or constructive knowledge of the specific infringing content on its video platform, but refused to remove it.

185.    Defendant, instead, allows the same infringers to upload the same infringing content on a daily basis.

186.    Defendant knows exactly who these prolific repeat infringers are, yet takes no action to stop their infringing conduct.

187.    Every day more copies of the same infringing derivatives "Caramelo" and "Половина моя" are uploaded to defendant's video platform, most often by the exact same individuals.

188.    Defendant has refused to remove infringing content as described above, and is liable for the direct infringement of the Copyrighted Track.

189.    Defendant continues to distribute and public display the infringing content,

knowing it violates plaintiff's exclusive rights under Section 106 of the Copyright Act.

190.     Defendant will clearly continue to infringe unless the Court sends a significant message that defendant may not violate the rights of vulnerable independent artists in favor of the financial gain.

191.     Defendant has directly infringed plaintiff's rights, and plaintiff is entitled to its compensatory damages, plus defendant's profit in excess of plaintiff's compensatory damages.

192.     Defendant's conduct clearly satisfies the standard for enhanced damages set forth in Section 505(c) of the Copyright Act.  Plaintiff may elect a statutory damage award in lieu of its compensatory damages of up to $150,000, plus its reasonable attorneys' fees, and costs incurred in this action.

193.     Based on defendant's predatory conduct here, and steadfast refusal to stop infringing plaintiff's rights, only an award at the very top of the statutory scale will serve the interests the Copyright Act sought to balance.

**DAMAGE CALCULATION**

**Actual Damage Calculation**

194.     Plaintiff is entitled to its standard licensing fee for the Copyrighted Track of $5,000 per year (Internet only) for the three years prior to this Amended Complaint for a total of $15,000.  Plaintiff has also incurred more than $25,00 in legal fees directly due to defendant's infringing conduct.

195.     Plaintiff's actual damages calculation must be increased to include defendant's direct, and indirect, profit from its exploitation of the Copyrighted Track, in excess of plaintiff's actual damages, plus the reasonable attorneys' fees and costs incurred in this matter.

**Statutory Damage Calculation**

196.    In the event plaintiff elects one enhanced statutory damage award, an award at the higher part of the range is demanded by the facts and circumstances in this matter.

197.    First, the calculation should start at three times plaintiff's compensatory damages.

198.    Defendant's state of mind supports a much higher statutory damage award. Defendant has engaged in a policy and practice of depriving small content creators like plaintiff of any meaningful way to protect its copyrighted content, in favor of a system that encourages wide-scale piracy solely for the benefit of defendant.

199.    Defendant's failure to cease the unlicensed distribution and public display of the infringing content, after numerous DMCA Take-Down Notices and follow-up demands, directly informs the analysis concerning defendant's state of mind.

200.    Defendant has adopted a predatory strategy, favoring its partnerships with the largest companies in the music and media industries, and bullying a small artist like plaintiff.

201.    The forgoing supports the fact that defendant's state of mind was willful at all times relevant to this Amended Complaint.

202.    An additional substantial amount, subject to proof, should be included in the statutory damage award calculation as a deterrent effect necessary to discourage defendant from engaging in the acts described herein in the future.

203.    The enhanced statutory damage award, in light of the forgoing, should be $150,000, plus reasonable attorneys' fees and costs incurred in this matter.

**FIRST CLAIM FOR RELIEF**
**COPYRIGHT INFRINGEMENT**

204.    Plaintiff incorporates the allegations contained in the preceding paragraphs as if set forth here at length here.

205.    It cannot be disputed that the plaintiff has a valid, registered copyright, and owns all rights to the Copyrighted Track.

206.    Defendant without a license or authority, publicly displayed videos synchronizing the Copyrighted Track.

207.    Defendant continues, as of the date of this Amended Complaint, to publicly displayed videos synchronizing the Copyrighted Track without a license or authority.

208.    Defendant copied, distributed, and publicly displayed the infringing content for the sole purpose of commercial gain.

209.    Defendant refused to cease-and-desist after numerous DMCA Take-Down Requests.

210.    Defendant's commercial exploitation of the Copyrighted Track was not for criticism, comment, newsreporting, teaching, scholarship, or research.

211.    Defendant's commercial exploitation of the Copyrighted Track was not transformative.

212.    Defendant elected to reproduce, distribute, and publicly display plaintiff's synchronized Copyrighted Track, in its entirety, without a license.

213.    Defendant is barred from invoking the safe-harbor provisions of the DMCA.

214.    As a direct and proximate result of defendant's acts of infringement of plaintiff's exclusive rights to the Copyrighted Track as set forth in Section 106 of the Act, plaintiff has incurred damages, and requests an award of defendant's direct, and indirect, profits in excess of plaintiff's compensatory damages, and plaintiff's compensatory damages, plus costs, interest, and reasonable attorneys' fees incurred in this matter.  Plaintiff may also elect to recover one statutory damage award pursuant to 17 U.S.C. § 504(c)(2) for willful infringement/reckless

disregard of up to $150,000, but not less than $30,000 plus costs, interest, and reasonable attorneys' fees.

## SECOND CLAIM FOR RELIEF
## VICARIOUS COPYRIGHT INFRINGEMENT

215.    Plaintiff incorporates the allegations contained in the preceding paragraphs as if set forth at length here.

216.    Defendant had the right and obligation to monitor the accounts subject to DMCA Take-Down Notices.

217.    Defendant had an obligation to remove infringing content but elected not to do so.

218.    Defendant made these elections in favor of the financial gain expected from the relationship with its Content ID partners and accounts with a large number of subscribers.

219.    At all times relevant to this Amended Complaint, defendant had knowledge of, and directly aided, the third-party infringers.

220.    As a direct and proximate result of defendant's acts of vicarious infringement of plaintiff's exclusive rights to the Copyrighted Track as set forth in Section 106 of the Act, plaintiff has incurred damages, and requests an award of defendant's direct, and indirect, profits in excess of plaintiff's compensatory damages, and plaintiff's compensatory damages, plus costs, interest, and reasonable attorneys' fees incurred in this matter.  Plaintiff may also elect to recover one statutory damage award pursuant to 17 U.S.C. § 504(c)(2) for willful infringement/reckless disregard of up to $150,000, but not less than $30,000 plus costs, interest, and reasonable attorneys' fees.

## THIRD CLAIM FOR RELIEF
## CONTRIBUTORY COPYRIGHT INFRINGEMENT

221.    Plaintiff incorporates the allegations contained in the preceding paragraphs as if

set forth at length here.

222.    Defendant had knowledge of the infringing activity; and materially contributed to the activity.

223.    Defendant was put on notice of specific infringing URLs, but elected not to disable the content.

224.    Defendant then materially contributed to the infringing activity by highlighting the known infringing content by placing it in specific playlists.  This allowed for a massive acceleration in the unlicensed distribution and public display of the infringing content.

225.    When a search was, and is, conducted on defendant's parent corporation's search engine located at <www.google.com> for the First and Second Infringing Derivatives, the unlicensed videos on defendant's platform appear as the first entry in the search.

226.    Defendant knowingly channeled any and all potential viewers toward content it knows is infringing.

227.    Defendant did the forgoing to feed the engine that generated billions of dollars in profits from advertising revenue, and the relationships it has with its Content ID partners and users with accounts that have a significant number of subscribers.

228.    Defendant had an obligation to remove infringing content but elected not to do so.

229.    Defendant made these elections in favor of the financial gain expected from the relationship with its Content ID partners and accounts with a large number of subscribers.

230.    At all times relevant to this Amended Complaint, defendant had knowledge of, and directly aided, the third-party infringers.

231.    As a direct and proximate result of defendant's acts of vicarious infringement of plaintiff's exclusive rights to the Copyrighted Track as set forth in Section 106 of the Act,

plaintiff has incurred damages, and requests an award of defendant's direct, and indirect, profits in excess of plaintiff's compensatory damages, and plaintiff's compensatory damages, plus costs, interest, and reasonable attorneys' fees incurred in this matter.  Plaintiff may also elect to recover one statutory damage award pursuant to 17 U.S.C. § 504(c)(2) for willful infringement/reckless disregard of up to $150,000, but not less than $30,000 plus costs, interest, and reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment against defendant, and awarding plaintiff as follows:

1. restitution of defendant's unlawful proceeds in excess of plaintiff's compensatory damages;

2. plaintiff's compensatory damages in an amount to be ascertained at trial;

3. a statutory damage award to plaintiff according to proof, including but not limited to all penalties authorized by the Copyright Act (17 U.S.C. §§ 504(c)(1), 504(c)(2));

4. an award of statutory damages for each violation by defendant of the DMCA, 17 U.S.C. § 1202;

5. plaintiff's reasonable attorneys' fees and costs (17 U.S.C. § 505);

6. pre- and post-judgment interest to the extent allowable; and,

7. such other and further relief that the Court may deem just and proper.

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: December 11, 2021
      New York, New York

GARBARINI FITZGERALD P.C.

By _Richard M. Garbarini_

Richard M. Garbarini (RG 5496)